case will be number 20-1240, 20-1275, 20-1276, 20-1283, 20-1287, and 21-1641. United States v. Luis D. Ramos-Baez et al. At this time, if Attorney Byrd-Lopez could introduce herself on the record, speaking. Apparently, we're having a little bit of trouble picking up on the recording, so if everyone can speak up, that will help a great deal. Sure. Sure thing. Does it sound okay right now? More. A little more. Okay. May it please the Court, Alejandra Byrd-Lopez, on behalf of Mr. Abelino Millan-Machuca, I'd like to request two minutes for rebuttal, if I may. You may. Thank you. The government's failure to disclose substantially verbatim statements of the only witness who connected Mr. Millan to specific drug trafficking transactions based on that witness's own personal knowledge warrants reversal in this case. During this trial, a cooperating witness, Mr. Orlando Ruiz Acevedo, also known as Gordo Ponce, testified that he engaged in drug trafficking transactions together with Mr. Millan, that Mr. Millan gave him heroin to sell at Ponce Minimum in the period between late 2015 and May of 2016, that together they engaged in this drug trafficking involving over 3 kilos of heroin, that Mr. Millan also sent through Mr. Ruiz heroin to Ponce Main and to Ponce 500, that he had turned over ledgers and money to a co-defendant or to a... Can I ask you, there's a Jenks piece to your argument and there's a Giglio piece to your argument, right? That's correct. On the Giglio piece, so assuming that the undisclosed information is not Jenks material but is only Giglio material, okay, and I take it you're making both contentions? So it's basically a Jenks argument with two different layers. The first layer involves the failure to turn over the raw notes of the investigator who to take down information that was so pertinent and so relevant. Independent of whether we agree with you as to any of it being covered by Jenks, I thought you were making a separate as to all of it Giglio argument in that various things were not disclosed even though the government knew it and that that material should have been disclosed and it would have helped you impeach. So let me flush that out a little bit because, yes, there is a Giglio implication to our argument but it is combined with a Jenks argument. Is there a stand-alone Giglio argument being made? No, I can't characterize it as a stand-alone Giglio argument, I don't think, because the idea is that the statements were never actually taken down. The government never put itself in a position to be able to determine whether there was a conflicting testimony or conflicting versions. I thought the government itself conceded that at some point prior to trial, after turning over the 302s, it knew he was going to testify to personal knowledge of Milan's drug dealing, even though the 302 by the government's own account didn't represent as much. Yes, but Giglio would cover testimony that was in conflict with the government that was And you're not saying that that would be such a salient distinction that they should have let you know about that distinction? There is a, well, the layered argument, as I say, the second part of it is that the court should, that it would have been normal to expect for the government to memorialize Okay, but we don't agree with you on that. Okay. Okay? You're not then making a separate Giglio argument that they should have informed you earlier? I thought in your briefing you did say they should have informed you at the time they knew that unlike in the 302, he was suddenly saying, no, I have personal knowledge of it, and that you weren't apprised of that and still weren't prepared for that. That is correct. That is correct. So the thing is that what the witness testified, what the witness testified is that he had told the agent that of this personal knowledge and these personal transactions, and he had seen them taking notes. And part of the problem here is that really, we at the time did not have access to enough information to formulate I guess what I'm trying to figure out is, and I don't know what we're supposed to do in evaluating this aspect of this Giglio thing. If you were given 302 and the 302 said, I don't have personal knowledge, but I know he's involved in drug dealing, then prior to trial, the government learns he's now going to say, I have personal knowledge of it. And then he testifies, and they don't disclose to you prior to that time. It seems to me there's at least a pretty strong Giglio argument that they should have told you. That would have been the case. No, no. If I understand the government in responding to you in their brief, that's what they seem to say happened. But then you're right. The record seems to say that the witness in testifying testifies that he did tell the government at the time of the 302. So I don't quite know what we're supposed to do with that set of circumstances. I think this is a very peculiar situation, but to put it clearly, if the 302 said I don't have personal knowledge, and then later he said he did, then that would be Giglio. And they should have disclosed that statement as part of the Giglio disclosure. But wasn't your position in the 302? I'm sorry. Because 302 is just vague on that, right? Exactly. If I just may clarify, he doesn't say in the 302, I don't have personal knowledge. I thought you were proceeding in your argument on the understanding that the 302 didn't give you any notice that he had said he had personal knowledge. That's right. And the government, in its briefing to us, unless I'm misreading it, says the same, because it says it didn't understand him to have personal knowledge at the time of the 302. Am I misreading there? No, that's right. That's right. So don't we just take it since the government has said as much, if that's right, that the state of the record is you were informed that he had knowledge, but not personal knowledge in effect. Then they learned he had personal knowledge. And then, despite that, they didn't tell you that in advance. And I think that's right. And I think that's an accurate assessment, especially when one considers that the note, even the 302, does specify that the witness himself had transactions with other persons. So let's assume this is right, and maybe it's not, but if all of that tracks, then you have a further statement that the 302 notes and the margin notes were not disclosed either. And that material you claim is Jenks, but I think, unless I'm misreading you, you don't say it's only Jenks. In other words, it also should have been disclosed even if it's not Jenks material, or are you not making that argument? It should have been disclosed as Jenks, is the argument. If it wasn't Jenks. Should it still have been disclosed under Giglio? Well, I believe so, because it tracks, and it is more of a... So if you take the full picture of what was not disclosed about Bordo Ponce, what is the argument for prejudice, given the government's response to you, which is, okay, but you knew by the time of cross-examination that he was going to testify to personal knowledge. At the time of... By the time... Well, I'm sorry, you were able to cross-examine him. Exactly. And you had the 302, which you're saying didn't disclose that. So you had the opportunity to point out that divergence during the cross-examination. So what is the prejudice that follows from it? And how does that prejudice, in light of all the other evidence against your client, suffice to say that the conviction... Okay. So as to the first part, the prejudice is the uniqueness of this testimony, as against Mr. Millan, really, potentially, could have had a different effect on the jury determination. That's basically the prejudice. But that's also given all the other evidence about him being as high up in NIETA as he was, which isn't... It seems quite strong independence of this, not relying on this witness for that, and all the evidence of NIETA being involved in drug traffic. So what the evidence showed here, and as part of our argument, is that here there was a lot of evidence of a very dispersed and multiple conspiracies that were independent of each other and autonomous from each other. So the evidence here really showed that Mr. Millan, even the government's evidence, showed that Mr. Millan took the NIETA's original mission of advocating for prisoners very seriously. And in the calls that are recorded, there is one call, which is alleged to be a meeting of the maximum leadership, where instead of focusing on any drug trafficking activities, they focus on food service, on bed sheets, on programs for prisoners, on getting jobs for prisoners. It has to do with the evidence in the record of his involvement in drug distribution. He did all this other stuff, but there's also evidence of his direct involvement. Including the controversy that Judge Barrett is trying to flesh out right now. Right. Well, that's the thing. There is not a lot of evidence against Mr. Millan that is specific of his involvement as in drug trafficking activity, which is fleshed out and specific. There's a lot of evidence of the organization being involved in it and him being the maximum leader of it. And if the point is that that's not enough to show a single conspiracy for NIETA, this testimony by Gordo Ponce doesn't speak to that question. No, but it does. So if the evidence is strong enough to show that NIETA was involved in drug trafficking and the evidence is strong enough to show he's the maximum leader, what is the prejudice from this particular conclusion of the evidence about his direct involvement? Because It seems to only speak to whether NIETA was involved in drug traffic. Because the evidence as to Mr. Millan does not show that his role as leader or the way he saw his role as leader was to supervise drug trafficking. The evidence doesn't show it and the government does not point to specific instances in the record that show it. And we know that from knowing about what there has to be this specific intent that's included in both conspiracies that he wanted to use the NIETA and use it for drug trafficking or that he was specifically engaged in this overall conspiracy of drug trafficking. And what we have is the evidence – is very standard evidence of his involvement in drug trafficking other than Gordo Ponce's alleged – his allegations in his testimony. This is what we're trying to figure out. We do have four of those testimonies. And so that's in there. And so the question is because of the failure of the government to disclose certain things, how are you establishing prejudice? Because the violations that we're alleging should have required the striking of that testimony. There is no lesser sanction for a gent's violation. Only if it's a gent's violation, not a particular one. Well, JBLIO would involve potentially a cause for a mistrial. And the thing is that when you – when our defense was based so strongly on his role as a – as really more of a figurehead of the organization that was interested and engaged in promoting the legitimate part of the organization. And if I just may finish this thought. Just for a second. So – I'm sorry. Go ahead. I just want to circle back on the gents for a minute. So in terms of the notes, you would agree that they only had to turn over the notes if the notes were in conflict with the 302s, right? If the notes are consistent with what ended up in the 302, the notes don't have to be turned over. Yes, but the notes include a lot of information that is not in the 302. Among others, they include information that this witness was in segregation at one time in one of the prisons. That could indicate that he had an issue with Vinyerta. So there's a little issue there. And it includes information about drug quantities that circulated through different institutions that was not included in the – in the 302 at all. It was omitted. There is information – there's some of the statements about information that's included. There are names that are not included. There is – you have to go through it with a fine-tooth comb, and I would be happy to provide a supplemental letter with the – with just the citations of the differences between the notes and the 302. But there are differences. Contradictions or information – or more information? Only the notes or no contradictions, though? There are some contradictions. The drug quantity, at least your supplemental filing, says I think that there's a contradiction. Well, there's a contradiction with the testimony. Yes. Okay. And then – okay. So – and then you're relying mostly on Houlihan for the idea that they have to adequately record everything. But Houlihan involved the lawyer taking the notes himself to avoid – sort of cloak that information under the attorney-client privilege or the – or work product privilege. So you're not suggesting here – I don't understand you to be suggesting that the government's trying to hide the information, right? They just didn't – it just wasn't recorded by the agents. It's more of an omission than an affirmative act of concealment, right? I don't know that – I don't know if they were hiding the information. It seems to me surprising and extraordinary that – this is what we have. We have an investigator interviewing a witness, taking copious notes about all sorts of gossip, about who did what and who was the leader where, and when they – when he had personal transactions with this person and with this other person, and then all of a sudden when they're talking about the maximum leader of the association, who was the number one defendant in the indictment, and this briefing – this debriefing took place after the indictment had been already filed. We have the – at that moment, at that critical moment, we have the investigators putting their pencil down and not taking any notes about this witness's personal knowledge of face-to-face transactions with my client. And the government has offered no explanation and no legitimate – and I don't think there can be an explanation. Why wouldn't that be important enough to take down in notes? So I – you know, I don't know what was in the government's mind or in the investigator's mind, but that information, one would expect in the normal course of an investigation, would have been memorialized in order especially to be able to keep track of whether the story changed a little or whether there were – whether it was true and credible for them to then use it in a trial. But we don't have that, and therefore, we don't know if there were evolving versions of this testimony, if there was any kind of change that could have been used by the defense to conduct its cross-examination of this witness. So with that, I understand that this – and just one last note is that the case law tells us that neither the court nor the prosecutor is in a position to determine what use the defense counsel can make of these notes. That's not – they're not in the best position. Defense counsel is in the best position to determine it, and that's why disclosure is required. Thank you. Thank you. Thank you, counsel. At this time, if Attorney Pimentel-Soto would please introduce herself on the record to begin. Good morning. May it please the Court. I am Candice Pimentel, and I represent Mr. Eduardo Rosario Oramiel. Can I reserve three minutes for rebuttal, Your Honor? Mr. Rosario did not receive a fair trial, judges. After discounting the evidence improperly admitted, the government failed to prove Rosario's guilt with unreasonable doubt. At the very least, a new trial should be granted because of evidentiary errors that were not harmless. The evidence against Rosario was not overwhelming. Over Rosario's objection, testimony in the form of a lay witness, which was not based on experience or personal knowledge, was admitted. And most of the incriminating evidence against Rosario consisted of hearsay statements. Two out of the three witnesses connected Rosario with the charged offenses testified all based on information they had been told by non-charged individuals. And this, the record does not support a finding of rule of evidence 801 to have admitted this testimony on this record. And the district court, this error is expunged because the district court failed to make a Petro-Ciello finding when the district court was asked to make it. Is that way, is that way they, he asked and you said, somebody said they wanted to make a Petro-Ciello. They wanted to be heard on Petro-Ciello and then it just went right by. Our position on that is that all co-defendants joined the request to make a Petro-Ciello finding when the evidence at the beginning of these hearsay statements were coming in. And at the close of the evidence, the government themselves asked the court that, remind the court that the Petro-Ciello issue was pending. The defendants, I mean, the issue was before the court. We didn't need to repeat the request to the district court. So, I do, you do need to repeat the request. At the close of the evidence, the defendants have to repeat the request, correct? Correct. But that request was already before the district court. The district court was asked to make the findings. And when the district court said, does anyone want to be heard on that? Yes, we did. We made no argument. The government made no argument. Our position is that that was just to request the finding was sufficient to have that waive the matter in the sense that it is the government who is the proponent of the evidence, of the hearsay evidence that they're proposing the court to admit. So, if the court asks for argument, one would expect that the party who has the burden to show and convince the court that the preliminary findings are on the record is the government. So, I submit that defendants had not waived the issue. But it was defendants' hearsay objections. And then you get hearsay to Petrocelli. And then our case law says it has to be renewed. And when the court asks, does anyone have anything to say? I mean, one would expect the defendants to at least renew their objection to the admissibility. Well, our position is that in the sense that the issue was before the court at the close of the evidence, that was sufficient to put the district court in a position to make the finding have the court believe that the record supported that finding. And what you're saying is the way to understand the record is that when the government said to remind them, that's effectively you understood it's been renewed. When he says we'd like to be heard on it, your position is we have nothing more to say than what we've already said. So, that wasn't a waiver of the request for the finding. It was just that we don't have anything additional to say at that point. Is that the idea? That's correct, your honor. And also, that the burden to convince the district court. And then the government said nothing. So, then you thought, what do I need to say? There's nothing to support it. That's right. But I would like to distinguish Mr. Rosario's hearsay argument and Petrocelli issue from the other defendants. In the sense that Mr. Rosario is not attacking overall all the hearsay evidence that got into the record. Mr. Rosario is attacking the particular statement that connected him to the conspiracy in this case. So, there were three witnesses that actually testified specifically regarding Mr. Rosario. Two of them, two of them based 100% of the incriminating statements against Rosario on hearsay evidence. So, Gordo, just to call him the way he was known. If there's been a Petroziello finding, all of that evidence would be fine, admissible, right? You're saying there's something beyond the 801? Yes. Yes. I'm saying that the Petroziello only compounds the error as it pertains to Mr. Rosario. But specifically, the record will not support any 801 findings in regards to the testimony that these witnesses provided. Fruitsa Severo, which is Gordo, said that the information he provided the jury that Barba was drug dealing was because Negron and Boringo told him. So, he had no personal knowledge. He never served prison with Mr. Rosario. He never had any observation of Rosario engaged in any wrongdoing. So, we're not attacking overall the lack of Petroziello finding or the hearsay statement that came in in the whole trial. But specifically, the testimony that connected Rosario with the conspiracy. Just so I understand your response, Fruitsa Severo, that's because you think with respect to that, no such finding could have been made? That's correct. But if such a finding could have been made and we disagree with you on that, then you don't have any ground for objecting to the inclusion of that evidence, right? Well, I would say that on the record, there is no support to find a conspiracy among Gordo and the non-suspected client, non-charged declarant. That goes to the basis for a Petroziello finding. That's right. That's right. So, also, Alvarez Medina, who was known as Pastor, said that he was told by Quintana that Barba would give drugs to him, to Quintana. So, again, we don't know who's Quintana, who's Baringo, who's Negron. There's nothing on the record to conclude that there was an ongoing conspiracy among these non-testifying individuals and the witnesses and or Mr. Rosario or the circumstances under which these statements were made. So, the district court can conclude they were made in Ferdinand. Could you address the misidentification issue and then the transcript? There's two kinds of misidentifications. There's the misidentification involving the photograph and then there's the misidentification involving the transcript. Yes, Your Honor. Mr. Rosario was named on the indictment as also known as Barba and also known as Chavon. So, let me just push it along. On the photograph issue, are you agreeing that we're on plain error as to that objection? Was there an objection below on that ground to the failure to disclose the misidentification? Well, Judge, we couldn't have made an objection or a motion before trial because we had no knowledge of the misidentification or the withholding of the misidentification. We learned it when the witness was on the stand. And was there an objection at that point? At that point, there was no objection. Okay. So, there was no objection during the trial even though it was learned during trial? That's correct. If we're on plain error, then burden is on you to show that even if you can show it was a clear or obvious error because this would have been pretty helpful information to have found out earlier that it was prejudicial. So, how is it prejudicial given that you did have it during the time when you could call the witness and question about it? So, Your Honor, Mr. Sosario's defense was focused on trying to convince the jury that he wasn't Cholon or that he wasn't Barba or that he wasn't the Cholon or the Barba that the witness talked about. So, that's one thing. So, this piece of information was extraordinarily important on his defense. Now, had he known beforehand that the witness testified before the grand jury regarding some other uncharged individual that the information provided was not about him, he could have done, he could have, for sure he could have prepared a better defense. For instance, one very important factor of this is that less than 60 days the witness was interviewed by the government. And even though it wasn't disclosed, the witness said he was shown only Sosario's photograph again. And then he said he provided other information regarding Sosario. So, had we known that the grand jury testimony was regarding someone else and not Sosario, we could have been able to go and do some research as to that individual. And the picture that was shown that led to the misidentification, am I right that that was another person known to Sosario? No. That record doesn't show it. That record doesn't show. And I don't think we can conclude that. And we have nothing in the record about what you would have been able to find about that person? Well, we knew that he was an inmate. And that would have been difficult to track down and to get records from the Puerto Rico authorities to maybe tell the jury that the mistaken was with Sosario, not with that other individual. So, I think that's a very serious prejudice that was caused in Sosario's defense. You could address the transcript. You knew the photograph wasn't your client, right? Well, we suspected the photograph wasn't of our client because what was told to the grand jury didn't coincide with what we suspected to have been told by us. But you have the photograph, right? But the photograph, then when it was produced because we asked for it, then it was of our client. So, that actually led the defense to believe that the defense was mistaken when we thought that he was misidentified before the grand jury. So, we had a suspicion, but when the photograph of our client was produced, the government closed that suspicion to then tell us, just in the middle of trial, that it was correct. He was misidentified before the grand jury. You're saying that the government gave you your client's photograph and identified it as the photograph that the witness identified during the grand jury proceedings? Yes, but what they didn't say was that what the witness told the grand jury was not about our client. When he was showing our client's photograph, what he said was not about our client. That was never told to us. So, in other words, he was showing the right photograph, but what he was saying was about a different person. That's correct. And then you were told later, here's the photograph he was showing, which was your client. And then you're only told later, actually, what he was talking about wasn't your client, it was a different person. During trial. That's correct. So, and we were focused on misidentification. So, when we received our client's photograph, we closed the door to our suspicion that he might have been misidentified before the grand jury, just to learn in the middle of trial that he was. So, we didn't... And how do you, in the, was there a photograph at some point of the person he was actually talking about? No, no, because that... You were just able to trace it by what they told you about who he was talking about? In the middle of trial. In the middle of trial was when we learned that somebody else, also known as Cholon, was the individual that he was talking about. But it's important to note that when the government went to the witness to then interview him, because apparently at some point the government might have learned that there was something going on here, they didn't show the other guy's photo. They show only Rosario's photo. So, we, by not disclosing that issue to us, they foreclosed our preparation for our defense on that false prejudice. And on the transcript, please? I think you're asking about the translation or the... So, Rosario is saying certain people are certain people and they're not? Well, that wasn't an issue that was included in my brief. I believe that was an issue that was included in another Codependent Brief. Did you join in it? No, I did not join because he didn't sustain to my client. Thank you, counsel. At this time, would Attorney Morales-Ramos please introduce himself on the record to begin? Good morning, Your Honor. Javier Morales on behalf of Luis Quinonez. We would like to reserve three minutes for rebuttal. At page six of the indictment, the government defined the enterprise. It is defined as three different entities. The Association for the Rights and Rehabilitation of the Inmate, comma, the Association for the Rehabilitation of Inmates, comma, and the Associación NIETA. The first entity that is presented here, there was no evidence presented during the jury, during the jury trial, excuse me. The Association for the Rights and Rehabilitation is an entity that, as of now, insofar as the evidence that was presented in the trial, is a ghost. The said entity was not proven to be also known as the second corporation, which was the Association for the Rights of the Inmates. The second entity was a corporation, a non-profit corporation. Also, for the Rights and Rehabilitation, the first entity was not shown to be or proved to be a.k.a. La Asociación NIETA. The second entity was a non-profit organization that was shown in trial to be active between 2014 through 2016. It was incorporated by Dali Cruz, which was a witness for the defense, and she testified about the purposes of that corporation and when she incorporated it and other stuff. The Asociación, that second entity, the corporation, the non-profit, was not shown to have the common purposes alleged at page seven of the indictment. At page seven, you have the purposes of the enterprise as defined by the government. There was no evidence that someone conducted or participated in the conduct of the affairs of the non-profit corporation through a pattern of racketeering activity. Basically, our position as to that definition is that the government did not prove the RICO enterprise that they have defined. On that same page of the indictment, at page six, also, we have a second problem with the RICO count, which is that the government is utilizing the enterprise as the RICO person. It reads, the Asociación NIETA introduced and distributed multi-kilograms of cocaine, marijuana, and heroin into the prison system of Puerto Rico for profit. Now, as I read RICO and as the case law states, the RICO person and the RICO enterprise are two distinct things. They cannot be mixed. But the enterprise can still have a business that's carried out by the individual. Well, the problem is that the definition is non-existent. Theoretically, yes, but in terms of the definition that we're dealing with here, we have the problem that we have a non-existent first entity, a corporation that was shown not to be involved, not to be used by the persons, the defendants, for the conduct of the racketeering activity. So, you have an entity that you have a RICO enterprise that is non-existent. I don't know if I'm making myself clear. The definition that they used was not proven. They did not prove the RICO enterprise as defined by them. And then, the distinctness principle requires a separation between the RICO person, which usually is the defendant, and the means of those individuals to commit the pattern of racketeering activity, and they're intermixed here. All throughout the trial, you see the government using the enterprise with this, the enterprise with that. A very specific moment, which I would like to bring to the court's attention, is when Judge Hillman is discussing with the government, Mr. Acevedo, something, and they were talking about allegedly participation of the first defendant, in the killing of Mario Emei. The judge tells Mr. Acevedo, but he did not participate in the killing of Mario Emei. The government responded, no, but the enterprise did. The enterprise did. What did the enterprise do? Nothing, because the enterprise cannot do anything, because it is separate from the defendant. It is not a RICO person. The other thing that I would like to bring to the court's attention is regarding the pretrocello, which you just spoke about. I presented that objection at the beginning of the trial, and I am the one that you were referring to when someone spoke about, I'll be talking about it later. The first person that brought this to the attention of the court, I believe, was a USA alum, and he brought it to the attention of the court. The court said, you know, okay, anyone has to say anything about it? I said, I will be addressing it. Later on, I did not address it specifically, but I did renew the objections that I had presented through the trial, and one of those was the pretrocello. Since I presented that to the court just minutes after we had spoken about pretrocello, it should be understood that I was also including my pretrocello objection. How is the court supposed to understand that in that way? You say I'm renewing all my objections, and how are they to know that you're flagging the pretrocello versus going over every objection that's been made, which the court's not at that point going to address? Because of the circumstances. Because I specifically told the court that I was going to address it, and then I renewed my objections. So, I mean, it seems to me that in the hecticness of the end of trial, that it just sort of got forgotten. That's what it looks like to me when I read it, right? Whose obligation is it to bring it up to make sure that it doesn't get forgotten? Isn't it the defendant's obligation? It's their objection. Yes, it's our objection. When it sort of goes by the wayside, I mean, whether there's error turns on whose obligation it was to revisit it, right? Wasn't it the defense's obligation to bring it up again? Yes, Your Honor. Say, hey, we forgot this, or this didn't get done, or we still need to do this. Isn't that your obligation? Yes, but it was first picked up by the government. So, you know, if they raise it up, and I say, you know, I'm going to address it, and I renew all my objections right after the issue of pretrocello was being presented to the court, I would assume, and I would think that the court just saw me two minutes ago, and I'm saying I'm renewing the objections. But then time goes on, and it's not addressed. Whose job is it then to say, hey, we need to do the pretrocello findings? Isn't that on the defense? When the judge starts to charge, and there's no pretrocello findings made, isn't that your obligation, someone on that side of the V? Well, I think that it was indirectly addressed when we requested instruction on multiple conspiracies, because part of the problem that we have in this case is that the evidence shows many small... No, I understand that. Pretrocello is separate from the multi... Yes, yes, yes. I understand what you're saying, but... Let me ask you this. Is it possible... Can the absence of pretrocello findings be harmless error, given the volume of the evidence? The problem in this case is that you have two counts. One, which is the RICO, which has a very specific element, and then you have the general conspiracy. The way that the government moved the case using the enterprise as the actor, it mixes so many things in so many absurd ways that it is difficult for me to answer your question. The use of the association NETA as the actor within the RICO claim creates that association, give by association way of talking that is thrown throughout the whole trial. There was one instruction regarding mere association, but one instruction regarding mere association is not enough versus all the information that the jury is receiving... I don't think you're responding to the specific question about pretrocello. If there was no finding and we conclude that it was preserved, and so it was not weighed, and there was an error because there was no finding, that would mean certain testimony is excluded. Yes. The question I think is, if we excluded evidence on that ground, would there be enough in what remained to render it harmless that the testimony was allowed in without that foundation? Maybe. That's a good question, but my question is actually a little bit different. My question was, can the complete absence of pretrocello finding be harmless? For example, if it is clear that there was enough under pretrocello, that had the finding been made, it would have been made, can the absence of explicit findings be harmless? I don't think so, because it's required by the law that it be done. It goes to the core of what pretrocello stands for. Well, what pretrocello stands for is that there has to be enough evidence for you to find that they're co-conspirators, and this co-conspiracy statement should therefore come in under 801. But if that fact is obvious without specific findings, in other words, if there's overwhelming evidence that those are co-conspirator statements under 801, it's a failure to make the specific findings harmless. I don't think so. That's my position. Do you have a case that said that? 801 doesn't require it. It's case law required, right? Yes, yes, yes. But we have pretrocello. If it's not going to be used, then we might just erase it from the reporter. The government hasn't argued that, have they? Has the government argued that there was overwhelming evidence to support the finding and so it's harmless? I think in general they did. Thank you. Thank you, counsel. At this time, would Attorney Aloum please introduce himself on the record to begin? May I plead the court, Alex Aloum on behalf of the United States. With the court's permission, I'd like to begin addressing the Brady claim that was raised by Ms. Beaman-Finn. I'm going to be candid with the court. I've looked at her brief multiple times and I'm still trying to wrap my head around this because prior to trial, specifically on the Brady claim, there was no evidence to support the finding. This is with respect to Gordo Ponce? Yes, Your Honor. No, I'm sorry, Your Honor. This is not with respect to Gordo Ponce. This is with respect to the grand jury misidentification. Oh, okay. The photograph. The photograph, correct. So, Your Honor, on June 17, 2019, the government sent an email to Ms. Beaman-Finn, which I believe is part of the record. The title of the email on the subject line, it says, Brady-Giglio Disclosure. The cooperator who testified in the grand jury, Miguel Alvarez, was shown a picture of Ms. Beaman-Finn's client and he identified this person as a Cholón who was – and the description that he gave did not correspond to Ms. Beaman-Finn's testimony. Fast forward, April 2019, as we are preparing for trial, he is interviewed again. He is shown the very same picture and he explained, no, that's Barba. He was at the jail 1072 and what he said then was consistent with his testimony. So, obviously, there is an inconsistency between what he said in the grand jury and what he said at trial. That information was indeed provided to Ms. Beaman-Finn and it wasn't just the pictures that were provided. Ms. Beaman-Finn was provided the grand jury transcript as well. So, she had all the tools that she needed to impeach the cooperator. You said pictures. She got pictures of both or only of her client? Your Honor, the same picture was shown to this cooperator in both instances. And that was a picture of her client? That is correct, Your Honor. And you're saying that the grand jury testimony, like if you put the picture next to the grand jury testimony, it's apparent that they're not talking about the same person. Is that what you're saying? That is correct, Your Honor. That is correct. But you never said there was a misidentification. You just dumped a bunch of stuff and if they looked at those two side by side, they could have been able to figure out that there was a misidentification. If Ms. Beaman-Finn looked at the picture and the grand jury transcript along with the 302 that she later, that we provided, it was obvious. What did the 302 say? The 302 identified him as Vada, as somebody who was at 1072, somebody involved in drug the testimony given by this cooperator at trial. And I would add, Your Honor... I'm not tracking this. Go ahead. Are you saying that it wasn't a misidentification because the witness did not identify the person in the picture who was the defendant as the person of whom he was speaking about? The person that the witness identified in the grand jury, the description that he gave this person was an inaccurate description. Of whom? Of Ms. Beaman-Finn's client. So she said that he was... The picture of her client was shown to the witness during the grand jury and it's clear that his testimony was about her client? No. His testimony was about somebody else and somebody else's activities that were attributed to her client in the grand jury. Would have that been clear just from reading the grand jury testimony? That is correct. How would have that been clear? Because at the time that she was given the 302... Okay, so it wouldn't have been clear until you got the 302. Correct, Your Honor. Okay. When did she get the 302? Is that during trial or before trial? That was before trial. And what... And then what happened during trial? Your time... You're mixing up all these timeframes. Before you get to... What is in the 302 that would have made it clear from the 302 that the grand jury testimony had to be about somebody other than her client? But isn't the 302 making representations about her client? The 302 is making representations about her client. And in the email, it was made clear that the same picture that was shown in the grand jury was the picture that was shown prior to trial to the witness where he gave an account of... He gave a separate account of that individual whom he was talking about and his involvement in the organization. I still just not following. Just walk me through. There's a grand jury. Right. There's a picture of her client. Correct. Who testifies about this person, says all these things. Correct. If that's all I knew, I would have no reason from reading the grand jury testimony that he wasn't talking about her client. That... If that's all you knew. Correct. I have the 302. He's making representations about the client. Right. If all I had was the 302, I'd have no way of knowing he wasn't talking about the client, right? If you have the 302... All I have is the 302. If all you have is the 302 without the grand jury transcript and without... Just... Then I would... Okay. Now you're somehow saying if I have the grand jury testimony and the photograph... Right. And I have the 302... Right. I'll know that there's an inconsistency between the 302 just from those documents? No, because we also made... Okay. So there's some other things the government has now done that makes it possible with those pieces in place to know about the inconsistency. What's that other thing? That other thing was that the statement that was informed that the... On what date? After the 302? On June 17th, 2019. After. After the 302. Okay. And what does that document tell her? It was an email... Well, the email explained that the same picture was shown to her client on the date of... On the date that the FBI interviewed him and that the 302 was generated as the picture that was shown in the grand jury. And how is that helpful to show that I know that he wasn't talking about the same person both times? Your Honor, I think the transcript of the trial makes it clear because Ms. Demente in her opening statement said that identity was going to be at issue at the trial. At the trial, she cross-examined this witness and she in fact... You just skipped ahead again. From what... The email that you sent, what about that email would have made it apparent that there was a misidentification? That he said one thing in grand jury... What in the email would have tipped her off? Did the email say that? The email included the grand jury transcript, included the picture that was shown... Did it say that they were talking... That he was talking about different people each time? Did the email include an explanation? The email included... Your Honor, if what the court is... If what Your Honor is asking me is if the government explicitly stated your client gave inconsistent testimony in the grand jury as what he told the agent, I don't know that it said it in such explicit terms, but all the information that she needed, all the information, all the giglio was provided to her. The giglio is that he was talking about two different people, when that was never told to her. It was made clear to her, Your Honor, because she was the... You're saying that you think she knew it because of how she conducted the cross. And her opening. And her opening. You're saying that... But we're asking a different question, regardless of whether we conclude that she, in fact, knew it. I'm trying to figure out what you said as the government that would have explained to her or to the defendant. And I'm just trying to figure out what it is that you're pointing to that says that. I don't see how the provision of the grand jury record and the provision of the 302 shows that. I don't see how the photograph alone shows that. Keeping in mind that giglio is a governmental burden. Correct. Okay. So Miguel Albert Medina, who's the government's co-operator, testifies in the grand jury. He's shown a picture of Ms. Pimentel's client. He's asked, who is that? He says, Choron, and he was in such and such a place. He misspoke. It wasn't... What he said was inaccurate, okay? Later on, we provide... Is there something about the grand jury testimony itself that would have made it apparent that that was inaccurate? If you compare the grand jury transcript with the 302 that was subsequently provided... That wasn't the question. Is there something about the grand jury transcript in and of itself that would have made it apparent that he was misidentifying the defendant? The grand jury transcript itself? No. Can I try this a different way? You send an email that says, Brady Giglio disclosure email. Correct. What... If you're reading that email, what would you understand the Brady Giglio disclosure to be? The Brady Giglio disclosure, Your Honor, would have been that there was an inconsistent statement made by the government co-operator in the grand jury and what he later told the FBI... And does the email say that sentence that you just said? It doesn't sound like an inconsistent statement. It just sounds like an incorrect statement based upon the evidence. So just to follow up to that, would you've understood there to be an inconsistent statement or do you've understood it to be a misidentification from that email? I would... The way I would describe it is a misidentification of... Did the email say that? Fine. The email did not say that. And just the 302 itself revealed that it was a misidentification? The 302, Your Honor... We assume you're consulting this 302 right now? I am. Oh. And we're assuming you haven't seen the part where it doesn't. After this 30-second delay. No, no, no. The 302 does not specifically... Okay, so just so we get it. The grand jury record does not itself reveal the misidentification. The 302 itself does not do that. And the email does not itself identify there being a misidentification. So I've got those three things right. And when you look at those, at each one in isolation... Yes. Okay. So just last question. What is it about the disclosure that you're pointing to that revealed that there was a misidentification? The way that the co-operator, the description that the co-operator gives of Mr. Rosario O'Donnell... It's so different from how he was described in the first one. That's the idea? Correct. Okay, so now she says her defense was about identification. Right. And you say, you just basically said the same thing, that she opened on misidentification. Right. As part of her opening, did she say there was a misidentification in the grand jury? You say she closed with it, but she's saying she learned it during trial. Is it your position that she knew it before trial? Or is it your position that if she didn't know it, it was her own fault? Or that it wasn't fully disclosed? No, well, she certainly knew it before trial, Your Honor, because as a matter of what I She told the jury that she did not mention her client's name because his identification was going to be at issue at trial. When she cross-examined... That would be true whether or not there was a misidentification. In other words, it wouldn't be a crazy position to take that you would say, you know, don't believe that he knew who she was talking about. That's pretty different than saying, and in pushing that point, I'd like to tell you that I can show that he misidentified the client. Those are two different points. And she did that in closing? Well, in closing, after she learned about the misidentification. Her contention is that wasn't disclosed earlier. So that's the point. Assume we think that there was a problem with the failure to misidentify. I understand your argument about why you stated that. But assume we think there was. For this purpose, you say we're on plain error. So that may go to how clear or obvious it was that there was a failure to disclose. Assuming that that was clear or obvious. With respect to prejudice, could you just address whether if there was a Big Wheel of Braden problem with respect to a non-disclosure of a misidentification? You're out of order. Whether that would be prejudicial, and if not, why not? I would say no, Your Honor. And the reason why is because he was identified. This Mr. Rosario was identified. And if I could just give a quick summary of what the evidence was at trial. Three cooperators identified Mr. Rosario as a YETA member. Mr. Godo Ponce, Mr. Orlando Ruiz-Acededo, identified him as Leader 2, which is a position of trust within the YETA, within the Association YETA. And that is the prison where most drugs were sold according to the testimony of Godo Ponce. Miguel Alvarez Medina, another cooperator, he identified Ms. Pimentel's client as somebody who supplied drugs to his friend. Mr. Jose Gonzalez Herrera, another cooperator, testified that... But that was his friend outside of the prison, right? I'm sorry? Supplied drugs to a friend outside of the prison? He had... Well, Mr. Rosario had a point of contact outside of prison who was also a YETA member and who was also indicted in this case, Cynthia Gonzalez Landau. And there is a recording of him talking to her about setting up a drug cartel. Drug deals. And Godo Ponce testified that he sold heroin for an individual who was also a supplier to Mr. Rosario Oranje. So we would submit, Your Honor, that the... And I should also add that during that call that was played, there were discussions between Mr. Rosario and the outside supplier of the Nientas to coordinate a meeting with tiradores, which is their word for drug sellers. Can you just... I don't want to move off this issue. People still have questions about it. But if you can move to the Godo Ponce disclosure issue. Yes, sure. Your Honor, I think it's important for the court to keep in mind that Godo Ponce was not a cooperator for years. He was not... He is somebody who decided to cooperate in 2018. The indictment in this case came down in 2016. When agents initially interviewed him, they wrote a very extensive 15-page report summarizing what he knew about the organization. The government, as I understand your position in your brief, is that at the time of the 302, the government did not understand him to have said that he had personal knowledge of Milan's drug use. The 302 neither said... I know that. It's vague. But I understood in your brief to us in response to the Jigo arguments, Jenks arguments being made. I understood the government, maybe I misread it, to take the position that the government did not know at the time of the 302 that he was going to testify to personal knowledge, which is how could you then disclose it because you didn't know it? Your Honor, the... Is that wrong? The prosecutors went... Well, let me just say this, the initial interviews were conducted by the agents. When this whole issue came up about his personal knowledge, it was during trial prep. It was during trial prep when the prosecutor, along with an agent, was met with Godo Bonsai  It was me, actually. And I went to the 302 with him and I asked him, okay, so and so, how do you know him? How do you know that he engages in drug trafficking? How is it? And then based on the answers that he provided, the prosecutor prepared his direct outline. And that is... Just so I get the dates, at the time of the 302, this is how you represented it in your brief, unless I'm misreading it. There was no indication at the time of the 302 that he was going to testify to personal knowledge. That wasn't part of the story. Well, Your Honor... Not that he didn't have it, just that he hadn't said that he had it. Your Honor, I don't want to mislead the court. I can't make a firm representation as to whether he... I thought you said to this court, in your briefing, that there couldn't have been a problem with not disclosing that at the time of the 302, because you can't disclose what you don't know. Exactly. But that means you must not... You must be representing to us that at the time of the 302, the government did not know he was going to testify to personal knowledge. We did not... We did not know that he was... That must be because at the time of the 302, whatever account he was giving didn't include that fact. I will push back on that, Your Honor. I'm not... Well, then if you did know it, then you could have disclosed it. And you didn't in the 302. Your Honor, the 302 is a summary of what he told the agency. Yeah, but it's a pretty salient fact if I say, he's involved in drug dealing versus I engaged in drug dealing with him. Those are two very different things, I think. Sure. Okay. So the 302 doesn't disclose the second. The 302 does not say... I thought the government's position was, that's not a problem that we didn't disclose that, because we didn't know it. He hadn't told us at the time. But now you're saying maybe he did tell you that, and it just wasn't written down, and so that wasn't disclosed even though we knew he was going to say that. What I'm saying, Your Honor, is that with the agents, the 302 that summarized, that was a mere summary of what he told the agents, was based on his knowledge of what various members of La Asociación Lleda were involved in, in terms of drug trafficking and other activities. Are you just saying you don't know whether at the time of the 302, he said he had such a knowledge? At the time of the 302, I was not present. I mean, there's nothing in the record that shows whether we know or not. No prosecutor was present at the time. But there's nothing in the record that tells us whether at that time he said it or not. That's the state of the record. That's correct, Your Honor. So can I just ask, what is the government's position with respect to when you did learn for the first time that he was going to say it? Did the government have an obligation, then, to let that be known to the defendant? Presumably, the defendant was no more capable of reading the 302 to see that he was saying that than the government itself was. Well, Your Honor, to the extent, and the government made this representation to the district court, certainly JANKS is not a shield to… to not disclose Brady, to not disclose Giglio. Those constitutional rights trump JANKS. We were aware of that. From our perspective, Judge, what the cooperator told us during the course of trial prep, this was just a few weeks before trial, there was nothing inconsistent with what he was telling us. Well, that depends on us accepting that. If we take the 302 to be, as you think it, unclear whether he's going to testify to having personality, changing to, I now have personality, whether that triggers Giglio. Maybe it doesn't. You can make an argument that it doesn't and assume how you would. But if it does, there isn't a disclosure at that time of that deviation. If we found there to be a deviation, correct? We were not aware of any deviation. What we were… Well, isn't your position that there was a deviation or are you saying there isn't a deviation? What's the government's position on that? Our position is that there was no deviation between what is stated in the 302. Which talks about the general. Which talks generally, right? And the greater detail that he gave during… So, effectively, you say she should have assumed if it's possible that the reason he said he had that knowledge, his personal knowledge, that she should be ready for that. Well, if… That's the idea, right? Well, Your Honor, if he's saying that Mr. Miyama Chuka is the maximum leader and he engages in drug trafficking, obviously, there is some basis of knowledge that he has that from. And the knowledge being that he personally engaged in the drug dealing with her? Yes, Your Honor. And I think the question that's raised by this issue is to what extent does the government have an obligation to generate work product that is inculpatory rather than exculpatory or impeach? Obviously, we recognize that we have an obligation. Why wouldn't that be impeachment? I'm sorry, Your Honor? If he disclaimed knowledge, if we view it as him disclaiming knowledge of specifics during the first go-round, which produced the 302, and then he gets more specific, why wouldn't that be impeachment? If he disclaimed knowledge during the first go-round and then he said something inconsistent during the second go-round, I agree that that would be impeachment, but we have no evidence that that's what happened. So it's certainly different. I'm sorry? It's certainly different. You have general specifics. That's very different. We have... Unless you're saying that the general necessarily reasonably includes the specific. The general... But, Your Honor, I don't think that different is whether it's inconsistent. And... We've said sometimes the omission. I'm sorry? We've said sometimes the omission of the detail can be sufficiently salient to create an inconsistency. Of course. It's the kind of thing that anybody telling that story would have told the first time. So if they didn't say it, the fact that they said it the second time, it's not strictly inconsistent, but we have case law that says, yeah, but I could certainly make hay of that with a jury by saying anybody who told the story the first time would have said the reason I had the knowledge was because I was engaged in trading heroin with them. So if he now says that's what I'm doing, the thing you could do on cross would be to say, well, it's not what you said the first time, et cetera, et cetera. Okay? That's the force of the argument. So we're just trying to get a sense of what's your response to that. Sure. And I think that that would depend on whether he was specifically asked and whether he denied having... Right. So what do we do if we don't know? Because all we have is the general preemptive. The government in that setting, knowing that's all that the defense has, have some obligation to say, you know what, this isn't what we've got an indication he said the first time. Or not. If you say no, why not? Your Honor, I would say no because the 302, and this is something that the judge, the district judge looked at in camera, and he looked at both the 302 and he looked at the rough notes. They were translated to him verbatim. And he made a finding that the testimony merely gave greater details than what was included within the 302. He didn't find that there was... And that's why he didn't think that striking his testimony was warranted. If we disagree with the district court, what is the government's response? If you disagree with the... I'm sorry, if you disagree in what sense, Your Honor? If we disagree with the district court, that we don't think it's just an elaboration, that there's material difference between the first statement and the second, what is the government's response in not producing it? I think that... I think under that... I think if you were to disagree with the district court, Your Honor, that then the court would then have to look at the prejudice, whether the defendant was prejudiced, or whether the defense was prejudiced by not being able to cross him on that. And we would submit that based on the volume of evidence that was presented at trial, that there was no prejudice. And as a matter of fact, Your Honor, and I'm happy to... We're happy to bring this to the court's attention in a 28J letter, but this court, and I believe it was you, Judge Thompson, who offered the opinion in Tucker, that was a case where an individual was... who was under investigation, and could possibly have been charged by the federal government, that information was not turned over to the defense. And notwithstanding the fact that I think all parties agreed in that case, that there had been impeaching information that had been withheld, that no prejudice ensued. So, if it's in the Agent 302, and then he testifies about it, is it your view... Did she cross-examine on the difference between the 302 and the testimony? The 302 was used during cross-examination. You had disclosed it by that point that there was... Oh, no, because he testified. Correct. So, the information was used during trial? Yes, Your Honor, it was. But if there was a jigwheel problem, it was a late disclosure. It only came out at trial. If there is a jigwheel problem, then it would be a matter of late disclosure, although our position is that there was no jigwheel problem. If I can move on... If I can move on to the... Petro-Ziello. Petro-Ziello issue. Your Honor, this court's case law is clear that it is the government's burden. In this particular case, there was one objection raised when a co-conspirator, towards the beginning of trial, when a co-conspirator statement was being introduced, and the judge sustained the objection and asked the prosecutor to clean it up. All right, so we got all that. Okay. At the close of the evidence, right before the government rested, the government... There was a sidebar, and the government asked Judge Hillman to make a finding that the statements that had come in, the co-conspirator statements that had come in, were made during and in furtherance of a conspiracy. He specifically asked, does anybody want to be heard on that? The only one lawyer responded, and he said something along the lines of, I want to raise a Rule 29, and then just left it at that. It was never touched upon again. So from our perspective, the issue is with... The confounding thing here, potentially, is the government having raised the issue itself for the finding. Is that your understanding? I'm sorry, Your Honor. At the end of trial, your opponents say the government itself said to the judge, don't forget to make the finding on Petrozzella, or something like that. That's correct, Your Honor. So that's a pretty unusual circumstance. If the judge then says, does anybody want to be heard on that? You would think not, does anybody want to make the objection? But do you have anything you want to argue about that? But since, as you say, the burden's on the government... No, the burden is on the defense, Your Honor. You said government. Oh, I misspoke. I'm sorry then. I'm sorry. The burden is on the defense to raise. No, no, no, to raise it, but the showing... And to make a showing. They have to object, the defense has to object when the hearsay evidence is being offered, and they have to object again at the close of the hearing. The burden's on the government to make the showing that they're opposed to the hearing. The burden is on the government. That's right. So what their position is, is that when the government has remembered about the Petrozzella finding, which was great of the government to be candid and tell the court not to forget about that, okay. When the government, when the court then says, anybody like to be heard on that, since the burden as to showing that the evidence would support the finding is on the government, the government's silent, why do they need to say anything? How is that a waiver? That's their contention, if I'm understanding this right. There's no waiver because it's before the court, the court's asking, has anybody got anything to say about it? Not, is anybody making the objection? Nobody made an objection, and I would argue, Your Honor, that the court implicitly made the finding by not striking the evidence and letting the evidence in. And nobody asked that the evidence be stricken. Are you saying that the government met its burden by the sheer fact that it put on the evidence that it needed in order to meet its burden? Correct, Your Honor. Yes. There's two very different accounts. One is there's a waiver. Right. If that's true, we don't evaluate whether the government did meet its burden. Right. The other is it was implicitly a finding based on the show. The government stood by its record. Defendants thought that record's not going to support it. No one had anything more to say. But there was no confusion that a decision was being made. In that instance, we then have to review whether there's a basis for the finding. Those are very different situations for us as an appellate court. Your Honor, when the issue was brought up and the defense knew that the issue had been brought up and no objection was raised, there can be no clearer sign that they have relinquished the issue. So your position is there was no implicit finding? I think I'm making two alternative arguments. One argument is that the issue is waived because they never… It's hard for me to see if there was an implicit finding. I can't quite see what the waiver is. There might be a different version of it, which is the version Judge Burroughs asked, which is if there was no finding and we conclude there was no waiver, might it nonetheless be harmless because the evidence in support of the finding is so overwhelming that it doesn't matter that there was no finding? And is there a case law that suggests that a failure to make a finding can be harmless when the evidence is overwhelming in support of it? Yes, there is. You have a… You can send that in the 28th day. Yes, I will.  This is a transcript that was played at a prior…at prior trials where one of the speakers had been identified as Claudio, who was not a defendant in any of those prior trials. During trial prep, when the witness was being…he was listening to the recordings along with the transcription and translation for purposes of him being able to authenticate it at trial, he clarified that the individual identified as Claudio was not in fact Claudio but was somebody else. The government at that point did eliminate or crossed out or whited out Claudio and, Your Honor, we recognize that from our perspective, it was clear. We do candidly recognize that we could have been clearer, we should have been clearer, but it was something that… Was that the first time that particular witness had heard that recording? No, Your Honor, but during that…I think part of the confusion, Judge, is that during that part of the recording, one of the speakers refers to Claudio and that may be why it was listed as Claudio on the thing. And the reason we eliminated Claudio… Was that the first time that particular witness has heard that video? That recording? No, that was not the first. So the first time he heard it, did he identify Claudio as Claudio? Or was he asked to identify the participant? That particular recording, the prior times he heard it, Judge, it wasn't really not much was put on it because Claudio was not a defendant in those prior trials. So he certified the…I think it was the cover page that listed the speakers, the various speakers, and he signaled it as certifying the identity of the speakers, but at trial, at one of the prior trials, he was asked, who is Claudio? But he was not specifically asked, is that Claudio's voice that you're hearing in that recording? Just to follow the timeline, on your account where you say you should have, I know, even if that's not a confession that there was a failure to disclose of the legal obligation, but if you say you shouldn't, you should have done it then, and it wasn't done, so if that disclosure doesn't itself count, and I know you're not taking that position, but if we were to come to the conclusion that the disclosure at that point of just the transcript doesn't count as a disclosure, when is the moment by which the government is making clear that there was a misidentification or a misdescription? I believe it was at the second day of trial, Your Honor. Second day of trial, and so their contention is, by learning it for the first time at that late date, that prejudiced them in various ways, and what's your response to that? Well, Your Honor, if it prejudiced anybody, Judge, I think it would have prejudiced Claudio, who hasn't even made an issue of it during this, during this appeal. Their contention is it would have aided them in making the case for that transcript not going to the jury room, where it would have had the imprimatur, give it some more weight than it otherwise would have had. It would have just had that, I guess, been read out or something like that. My, well, the corrected version of the transcript was they'd go to the jury. Right, and their suggestion is that if they had known that, they would have put it to better effect in making the case for it not going into the jury room at all, even as corrected. And they didn't make that argument. They didn't make that argument, and I can't see, even if we had made that disclosure sooner, I'm not sure that the judge, I don't think that the judge would have made a different ruling. If there are no other questions, Your Honor, the government asks that the judgment below be affirmed. Thank you, counsel. At this time, if Attorney Byrd would reintroduce herself on the record for a two-minute rebuttal. I may please the court, Alejandra Verlopez again, on behalf of Mr. Avelino Millan-Machuca. I just want to preface my comments by noting how many of the errors that have been raised in this case pertain to what seems to be a lack of transparency or at least a lack of sort of a fulsome disclosure of important information that should have been known by the defenses during the defense. And I'm not attributing, I'm not saying it to attribute a mis-season, but I do think it's important to note because the truth is that to the extent the government is given an open field, they will go right up to the end of that field and push the envelope to protect what they understand is their right to have a strategic advantage in the trial. So it's important that this court give the government guidance, clear guidance, with consequences so that they know exactly what it is expected of them and what they should do when confronted with the kind of problems that they were confronted with here. And it occurs to me as I was hearing Mr. Olum speak about the transcript issue that there may be some confusion as to the claims that were presented as we were speaking about the Giglio and the Jencks earlier. So I want to give a structure to my arguments just very briefly. Our argument that there was a Jencks violation is twofold. Number one, the raw notes that the 302 were based on were not disclosed and they should have been disclosed as Jencks. They contain information that is not in the 302 and therefore contain Jencks statements that were not provided. The second part is that the failure to actually document any information that was provided about personal knowledge about direct – I'm sorry, if I could just get a couple more points out. The failure to document any statements that were made in that initial debriefing constitutes a failure to comply in good faith with Jencks. And the reason we have no evidence of a discrepancy between what he said in the debriefing, what this witness said in the debriefing and anything he may have said later is because it was not documented. And I think the government has a problem either way. Because if they found out three weeks before trial that all of a sudden this person has – Just a very simple question. Are you making a separate Giglio argument about the failure to disclose that he was going to testify about personal knowledge? I – but the other – I'm just asking – just that as a simple question. No.  But the Jencks – the Jencks violation is related to Giglio. I got it. I got it. The notes are only – the notes are only a Jencks violation if they're a statement of the witness versus a statement of the agent. So there would be Giglio material if there was an inconsistency between the notes and the 302, right? Yes. And – well, Giglio pertained, yes, to his expected testimony. I mean, any kind of conflict or contradiction that's clear would have been Giglio. Right. So – But the notes – the notes are – they're only Jencks if they're a statement of the witness versus a statement of the agent, which turns on whether they're a verbatim account. Right. So we argue that they are a substantially verbatim account. They don't have to be adopted by the witness because the statute definition of a statement does not include that requirement. They are placed in the alternative. So this is a substantially verbatim account. And we know that because the notes actually have even some statements that are in the first person in the voice of the witness. And the – and they were taken contemporaneously. And the witness said he saw the person – We got it. People taking the notes. Thank you. So – Thank you. Okay. Thank you. Thank you, counsel. At this time, Attorney Pimento, please introduce yourself on the record at the beginning of the two-minute rebuttal. Yes. Good morning again. This is Attorney Candice Pimentel. I would like to address two issues. One is your honor questions regarding whether the absence of a Petrocello finding could be harmless considering the evidence. And my answer to that is no, as to Rosario. It cannot be because the argument of Rosario is more focused on that the testimony that was provided by two of the only three witnesses that connected him to the charged conspiracy were all based on hearsay testimony. The testimony of Ruiz Acevedo and Alvarez Medina incriminating Rosario 100 percent was based on hearsay coming from non-charged individuals that the record would not support any findings that they were in a common conspiracy and – But you did not ask – you were not the attorney that spoke in response to the government or the courts in Peru with regards to Petrocello, correct? No, that's right. No, no, no, no. But I would say we all joined when we first asked the court to make that. And I would like to address that a little bit more because if, for instance, the government is making a direct dissemination of a witness and the government all of a sudden say, it's like that, that's hearsay, does the court expect the defendant to raise and say, your Honor, I joined, it is hearsay? The burden is on the defendant to make the objection timely, to give opportunity to the district court to address the mistake or the miscibility of that evidence at that moment. And that will actually happen in this case. Were there any ground rules at the beginning about the defense applications, did they speak separately or was there a presumption that every defendant was joining and every other defendant for purposes of trial management? The record should reflect that Judge Hillman established that we were all joining in the objections that were made. And, your Honor, very briefly, I would like to address the Brady issue. So during trial, this is what the witness say, I made a mistake when the government asked, because, of course, the defendant, I would have never asked him whether he had any doubts that my client was the one he saw in the picture. So the government asked, and he said, I made a mistake, I talk about Cholon, Kakias of State 1 prison, because there is Cholon, there is Kakias, and there is Cholon Barba, and Barba, which is the third one. So during trial, we learned there were three Cholon, three Cholon Kakias, and the defense of Mr. Rosario was focused on misidentification, not because he might have suspected, but notwithstanding the government having told him that the same picture was shown to the witness during the grand jury and during the interview. So Mr. Rosario went to trial believing that he was in a worse position than if he had known that he... I'm sorry, you opened on the misidentification issue. Yes. So what you're saying is that you could have opened more specifically on that issue, but it didn't change your defense, just would have made it a little bit better. Well, not a little bit better. It would have been dramatically better in the sense that when our defense on that issue was because we knew that two out of the three only witnesses that talk about Mr. Rosario were speaking based on hearsay evidence. They had never actually spent a lot of time with Rosario, and they had never seen him done any wrongdoing or committed any knew that, not because we had any suspicion that he was actually... No doubt in their mind about whether they were accurate. Correct. Correct. And so it was based on the nature of the evidence that we knew the government was coming forward in trial. And the fact that the third witness that only testified based on personal knowledge was a witness that had been with Rosario in a prison facility back in 2008, 11 years before trial. And he only spent four months in the same prison as Rosario. And that's the type of research and fieldwork that we would have been able to do had we known there were three witnesses. Thank you. At this time, would Attorney Morales please introduce himself back on the record? Again, he has a three-minute rebuttal. Yes, Attorney Javier Morales again for Mr. Luis Quinonez. Your Honor, given that the government did not address our arguments regarding the improper definition of the RICO enterprise and the violation of the RICO distinctness principle, we will not be presenting a rebuttal. Thank you.